VILLAGE OF FOX LAKE, Plaintiff-Appellant, v. THE AETNA CASU-
ALTY & SURETY COMPANY *et al.*, Defendants-Appellees.

Second District No. 2—88—0055

Opinion filed January 25, 1989.

888

Julius Abler, of Libertyville, and David E. Schwartz, of Soffietti, Johnson, Teegen & Phillips, Ltd., of Fox Lake (Howard R. Teegen, of counsel), for appellant.

Gary L. Griffin and Carmen L. Fosco, both of McNeela & Griffin, of Chicago (Cornelius Francis Riordan, of counsel), for appellee Aetna Casualty & Surety Company.

Walter E. Trittipo, of Speckman & Trittipo, Ltd., of Chicago, for appellee Santucci Construction Company.

Garfield & Merel, Ltd., of Chicago (Anita R. Obrand, of counsel), for appellee Angelo D. Ventrella.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

On September 28, 1981, plaintiff Village of Fox Lake (the Village) filed an action in the circuit court of Lake County against defendants Aetna Casualty & Surety Co. (Aetna) and Santucci Construction Co. (Santucci) to recover damages allegedly caused by Santucci's breach of contract for installation of sewer and water lines in the Village and by Aetna's breach of its performance bond obligations. The Village subsequently filed several amended complaints eventually making Angelo D. Ventrella (Ventrella) a party to the case in June 1983. In its complaint, the Village advanced several theories of recovery, all of which grew out of its claim that Santucci did not timely pay its suppliers and subcontractors.

In count I of its complaint the Village sought recovery against Aetna, as surety for Santucci, for breach of its bond obligation. Count II sought recovery of alleged out-of-pocket costs incurred by the Village from Aetna and Santucci. Count IIA asserted that certain sworn contractor's affidavits submitted by Santucci were fraudulent and that this constituted not only an actionable tort, but also an additional

breach of the contract. In count III the Village sought recovery on a third-party beneficiary theory claiming that it was a third-party beneficiary of the contract between Santucci and its surety, Aetna. Count IV sought exemplary damages occasioned by the tort of fraud allegedly committed by Ventrella as the individual who signed the contractor's affidavits on behalf of Santucci.

Aetna filed a counterclaim against the Village and a third-party complaint against Santucci. Santucci filed a counterclaim against the Village seeking recovery for unlawful termination by the Village of the contract between the Village and Santucci. Santucci also filed a third-party complaint against the Village's engineers, Baxter & Woodman, Inc.

Motions for summary judgment were filed by the Village, Santucci, and Aetna. The trial court, on December 16, 1986, denied the Village's motion, granted certain portions of the summary judgment motions filed by Santucci and Aetna, and denied other portions. Among its findings, the court held that Aetna's performance bond was limited to the penal sum of its performance bond; that the Village waived the liquidated damages provision of the contract between the Village and Santucci; and that Aetna effectively reserved its rights against the Village when it began performing on its surety bond contract. The court denied summary judgment with respect to the following issues: whether Santucci's breach of the contract was material; whether section 25(d) of the contract provided the sole remedy for the Village against Santucci; and whether the Village had a cause of action for fraud against Santucci and its agent, Angelo D. Ventrella.

Upon motions to reconsider, the court reaffirmed its denial of the Village's motion for summary judgment while granting Aetna's cross-motion for summary judgment and Santucci's cross-motion for partial summary judgment.

The record reveals that on December 15, 1975, the Village entered into a contract with Santucci for the installation of sewer and water mains within the Village of Fox Lake. Santucci, as principal, and Aetna, as surety, executed a performance bond in accordance with section 1 of "An Act in relation to contractors entering into contracts for public construction" (Ill. Rev. Stat. 1975, ch. 29, par. 15) (the Bond for Public Works Act) and in accordance with terms of the contract between the Village and Santucci. Both the contract amount and the bond amount were $2,491,906.75. At the time the contract was executed, the Village did not have the money to pay Santucci because it had not sold general obligation bonds to finance the project. The Village refrained from issuing a notice to proceed on the project

until July 1976 when it obtained sufficient money to pay Santucci.

In order for the work to proceed on the sewer and water mains, the Village was required to obtain easements from property owners so the contractor could perform its work on the private property of Village residents. Some of these easements had been obtained when the notice to proceed was issued by the Village engineers in July 1976. The original completion date for the project was July 1978. The completion date as fixed by the Village after it had granted extensions of time to Santucci was December 1978. As of either date, the Village had not procured all easements required for the completion of the work. As a result of the Village's failure to procure these easements when the project commenced, Santucci was, from time to time, forced to stop its work on one sewer or water line and relocate its forces to another area of the project. While the failure to obtain necessary easements did not cause a complete shutdown of the work, it did result in increased costs to Santucci and delays in the completion of the work.

Santucci submitted to the Village monthly pay requests for work done during the previous month. The contractor used the funds it received from the Village for each pay request to pay its subcontractors and suppliers for work they performed for Santucci during the period covered by the request. Santucci prepared the pay estimates for approval by Baxter & Woodman, the Village's engineers. These estimates, after approval by Baxter & Woodman, became the monthly pay requests which were then approved by the Village.

Santucci's contract stated:

> "In preparing estimates, the material delivered on the site and preparatory work done may be taken into consideration."

On numerous occasions during preparation of its pay estimates, Santucci sought oral confirmation of its right to payment of materials delivered to and stored on the jobsite but not yet incorporated into the work. On all but one occasion, approval of these requests was refused by Baxter & Woodman. According to Santucci, these oral requests were not inserted in the written pay estimates because their rejection would have resulted in payment delays of up to 30 days on amounts due on the balance of the estimate. Santucci claimed that at the time of the receipt of the Village's August 8, 1978, notice of termination, Santucci had approximately $62,000 in materials stored on the jobsite for which it had not been able to obtain payment.

Santucci's contract provided, in paragraph 25(a) of the general conditions, that the contractor's monthly program payment would be made by the 15th day of the month following submission of its ap-

proved estimate, provided that estimate was submitted before the first of the month. In Santucci's and Aetna's response to the Village's motion for summary judgment, the defendants stated that the Village was 6 to 13 days late in payment to Santucci on 5 of the first 18 pay requests. The defendants claimed that the late payments, coupled with a nonpayment for on-site materials, caused Santucci continuing cash flow problems which, in turn, affected the contractor's ability to pay suppliers as promptly as required by paragraph 27 of the general conditions of the contract. Paragraph 27 of the contract required Santucci to pay its suppliers up to the extent of 90% of the cost of materials delivered to the site no later than the 20th day of the month following that in which the materials were delivered and further required the contractor to pay its subcontractors no later than the fifth day of the month following that in which work was performed.

According to the defendants, the Village, as early as September 1976, was aware that Santucci was late in paying subcontractors and suppliers, but the Village also was late in September and October in paying Santucci because it did not desire to withdraw construction funds from a certificate of deposit without incurring a penalty for early withdrawal of those funds.

In November 1977, Baxter & Woodman, the Village engineers, talked with certain Santucci subcontractors and suppliers regarding their contention that Santucci was delinquent in its payments to them. These discussions prompted a letter from Baxter & Woodman to Santucci, requesting a supplemental contractor's affidavit from Santucci which would delineate the amounts paid and owed to each subcontractor. In addition, waivers of lien from subcontractors and suppliers were requested as additional evidence of payment. The letter further advised Santucci that if the Village did not receive assurances that Santucci had paid its subcontractors and suppliers, the Village would invoke section 25(d) of the general conditions to the contract between the Village and Santucci and withhold additional retained funds as security against nonpayment by Santucci to its subcontractors and suppliers. Section 25(d) provided that the Village may pay suppliers and subcontractors directly or withhold sums due them from Santucci if Santucci failed to furnish evidence of timely payment to the suppliers and subcontractors.

During the months of November and December 1977, the Village through Baxter & Woodman contacted several of Santucci's subcontractors and suppliers other than those who had complained to the Village of nonpayment to determine the status of their payments by Santucci. Baxter & Woodman determined that only 4 of 15 suppliers

and subcontractors had accounts with Santucci which were delinquent. On December 30, 1977, Santucci furnished partial waivers of lien to Baxter & Woodman evidencing payment to the four material suppliers whose accounts with Santucci were allegedly delinquent, as well as furnishing partial waivers of lien from other material suppliers.

On January 5, 1978, the Village's attorney wrote to Santucci and requested, pursuant to the provisions of section 25(d) of the general conditions, that Santucci provide evidence to the Village that all obligations set forth in the sworn contractor's affidavits furnished to date had been paid. Santucci responded by furnishing the attorney with copies of the waivers submitted on December 30, 1977.

On January 23, 1978, Baxter & Woodman reported to the Village that Santucci had not responded to the engineers' request or the Village attorney's request for evidence of payment. The engineers advised the Village that Santucci had "not delivered evidence of payment to material suppliers and subcontractors *** and apparently intends to ignore written requests for such." The engineers also reported to the Village, "Mr. Ventrella has given false sworn statements to the Village for the purpose of obtaining payment for work performed ***."

As a result of the alleged nonpayment of subcontractors and suppliers, the Village withheld payment on pay requests 18 and 19. On February 9, 1978, George Heck of Baxter & Woodman and Julius Abler, the Village's attorney, met with representatives of Santucci to discuss the matter of payments to subcontractors and suppliers. Don Hane of Aetna was also present. Jack Russell, Santucci's accountant, provided Heck and Abler with information regarding the status of Santucci's accounts with its material suppliers and subcontractors. Heck and Abler learned that the total unpaid balance due to subcontractors and suppliers was about $72,500 of the approximately $1.6 million of work which had been completed. Heck and Abler also learned that Santucci was questioning some of the outstanding balances of its suppliers and subcontractors because Santucci was not sure that all materials billed had been received. At the meeting it was agreed that all future pay requests to the Village would be accompanied by evidence of payment by Santucci, in the form of waivers of lien or cancelled checks, to its subcontractors and suppliers. It was further agreed that the Village would honor pay requests 18 and 19. On February 13, 1978, Santucci's accountant furnished to Baxter & Woodman an additional $273,862.62 worth of lien waivers and/or cancelled checks evidencing payments to subcontractors and suppliers.

Also, at the February 9, 1978, meeting, the Village attorney was advised that Baxter & Woodman had consistently refused payment for on-site materials. Attorney Abler ended that meeting with a clear indication that, for this reason, the Village would not thereafter strictly enforce the time and percentage limitation to section 27 of the general conditions of the contract.

On February 16, 1978, Baxter & Woodman formally recommended to the Village that it honor pay requests 18 and 19. At the time of this recommendation Santucci allegedly owed $100,000 to suppliers and subcontractors. Three reasons were given for the recommendation. First, Santucci had provided evidence of payments of approximately $550,000. Second, the Village had sufficient retained funds to secure itself against nonpayment of subcontractors and suppliers, and third, Aetna's payment bonds stood as additional security against nonpayment. The Village paid these requests in full.

Between February 28, 1978, and August 3, 1978, Santucci submitted pay requests 20 through 25 to the Village, which the Village fully honored. At the time the Village and its engineers knew that Santucci had not fully paid its subcontractors and suppliers. In its response to the Village's motion for summary judgment, Santucci asserted that the Village and its engineers did not recommend payment for these requests based on the strength of the sworn contractor's affidavits accompanying each request because they believed those affidavits to be false.

During the entire sewer and water project, Santucci's accountant Russell was responsible for the preparation of each pay request submitted to the Village. Each request was prepared on forms designed by Baxter & Woodman. The form of the request was at variance with the requirements of section 27 of the contract in that it required the contractor to certify to more stringent supplier payment time requirements. The forms contained an affidavit to be signed by a representative of Santucci.

In his affidavit filed in support of Santucci's summary judgment motion, Russell stated that the affidavits attached to all pay estimates were prepared by him in the belief that they were accurate. According to Russell, the affidavits were prepared in the belief that Santucci had met the requirement, therein contained, that payment had been made for all materials purchased and used to the date of the affidavit in the performance of the construction work under the Santucci contract with the Village. Russell's belief was based, in turn, upon the fact that Santucci's running inventories showing the gross values of materials stored at the jobsite, but not used in the work, always ex-

ceeded, from time to time, total amounts owed to Santucci's suppliers. Russell submitted the pay request and affidavits to Angelo D. Ventrella, Santucci's vice-president, who indicated to Russell that he was relying upon the accuracy of the figures which Russell had prepared.

Ventrella, in his affidavit filed in support of Santucci's summary judgment motion, stated that he signed each pay request and affidavit on the strength of Russell's representations as to the accuracy of the amount set forth in each request. Ventrella stated that he did not review the status of the accounts with suppliers before signing each affidavit but relied upon Russell's representations that the statements in the affidavit, regarding the status of supplier and subcontractor accounts, were true and accurate. Ventrella swore that at no time did he intend to deceive the Village of Fox Lake.

On August 8, 1978, the Village served upon Santucci and Aetna notice of its intent to terminate the sewer and water contract. Attached to the notice were 19 letters from various subcontractors and suppliers of Santucci purportedly demanding the payment of amounts due. The amounts claimed due totaled $223,528. The notice informed Santucci and Aetna that the failure to honor the demands for payment contained in the letters was in violation of section 27 of the general conditions of the contract and that unless the demands were honored within 10 days, Santucci would be terminated.

In its response to the Village's motion for summary judgment, Santucci claimed that of the 19 demand letters attached to the notice to terminate, six were duplications seeking payments totaling $72,335. Santucci maintained that evidence of payment for some of the amounts claimed in the notice as due had been previously furnished to the Village and its engineers. Approximately $34,000 of the amounts claimed due were disputed by Santucci, including a $21,500 bill from a supplier for materials delivered to and used by Santucci on another job. According to Russell and his affidavit in support of Santucci's motion for summary judgment, he was unable to respond for Santucci to the notice of termination because he could not determine, within the 10 days allotted, which amounts claimed in the notice were correct. Russell stated that subsequently, by comparing the attached bills and Santucci's records and books, he was able to determine that the amount of bills attached to the notice which were actually due and owing on the date of its service on Santucci was $59,000.

On August 22, 1978, Santucci was terminated by the Village for the reasons set forth in the notice to terminate, i.e., Santucci did not honor the demands for payment which were attached to the notice.

According to the deposition of Harold Kively of Baxter & Woodman, the Village held approximately $172,500 in retained funds as of the date of termination.

Santucci admitted to a violation of section 27 of the general conditions of the contract in the amount of $59,050.48. According to Santucci, this amount constituted about 6.7% of the $878,000 in Santucci's material and supplier obligations, paid and unpaid as of the date that the notice of termination was served upon the Village, and 1.9% of the total amount paid to complete the project.

After termination, representatives of Aetna met with representatives of Santucci. At this meeting, Santucci informed Aetna that it was wrongfully terminated and that the Village, not Santucci, had breached the contract. The representatives of Santucci requested that Aetna exercise its right to take over performance of its contract with the Village but only if Aetna did so pursuant to a reservation of its rights.

On September 5, 1978, representatives of Aetna, the Village, and Santucci met to discuss Santucci's termination and the performance of its contract with the Village. Aetna informed the Village that Aetna would take over performance of Santucci's contract with the Village but only under a reservation of rights because of Santucci's position that the Village, by terminating the contract, had breached it. Aetna informed the Village it would undertake performance of Santucci's contract subject to the following conditions:

(a) that Aetna, in taking over Santucci's contract, would not be waiving any rights which it may have if it was subsequently determined that Santucci was correct in its contention that the termination was unlawful; and

(b) that all of the rights of both Aetna and Santucci, including whatever right Aetna may have to additional compensation in the event that the Village's termination of Santucci's contract was found to be without legal justification, would be expressly reserved as though Aetna did not exercise its right to complete and, instead, the Village undertook completion of said contract.

In his affidavit filed with the trial court, Robert J. Balmer of Aetna stated that on September 6, 1978, he was informed by Village attorney Julius Abler that the Village would accept the reservation of rights, as proposed by Aetna, and that the Village understood that one of the reasons that Aetna was insisting upon a reservation of rights was that Aetna did not want to exceed the bond penalty. On September 7, 1978, Aetna confirmed the reservation of rights by let-

ter. On October 16, 1978, the Village board of trustees adopted a resolution formally acknowledging that Aetna was taking over performance of Santucci's contract subject to the reservation of rights. Aetna thereafter hired Carlo V. Santucci, Inc. (CVS), to perform the contract.

The contract between Santucci and the Village originally called for the installation of sewer and water lines in an area of the Village known as the Knollwood and Wildwood areas. In November 1978, the Village engineers informed Aetna that this part of the project would be done only if the Village could secure waivers from the residents of those areas of claims for. damages arising from the installation of sewer and water lines. The Village imposed this condition because it was fearful that the dewatering of the area would result in damage to private property, thereby subjecting the Village to damage claims by the owners.

Approximately one year later, the Village engineers directed Aetna to proceed with the Knollwood and Wildwood areas even though the Village had obtained no waivers from property owners. Aetna refused to do so and stated it would proceed in accordance with the directions given to it in November 1978, as it also feared damage claims from residents of the areas. In its response to the Village's summary judgment motion, Aetna stated that its refusal was also based on the fact that the Village's deferral in commencing the Knollwood and Wildwood work resulted in a delay in the entire contract which might subject Aetna to claims for liquidated damages under section 19 of the general conditions of the contract. Section 19 provided that time is of the essence as to all parts of the contract. The Village offered to waive the liquidated damages provision if Aetna proceeded with work in the Knollwood and Wildwood areas. Aetna agreed. In accordance with this agreement, the Village board of trustees on November 20, 1978, voted to waive the liquidated damages provision of the contract.

In May 1980, Aetna observed that the cost of performing Santucci's contract with the Village was approaching the penal sum of its bond, $2,491,906.75. Aetna thereupon informed the Village that once the penalty bond had been expended Aetna would cease performance because, pursuant to its reservation of rights, its liability was limited to the penal sum.

On June 24, 1980, Aetna instructed CVS to stop work because all that remained in the bond penalty was $6,229.71. The contractor ceased performance. Aetna offered the remainder of its bond penalty to the Village upon a showing by the Village that its net loss ex-

ceeded the contract fund. Thereafter, the Village hired CVS to finish the project and paid for the work done by the contractor to finish the project.

The Village then filed suit against Aetna and Santucci Construction Co. Angelo D. Ventrella was later joined as a party defendant on a fraud count against Santucci and Ventrella. Aetna filed a counterclaim against the Village and a third-party complaint against Santucci. Santucci filed a counterclaim against the Village. After the trial court, upon motions for reconsideration filed by the Village, Santucci, and Ventrella, granted motions for summary judgment adverse to the Village on its complaint and adverse to the Village on the issue of liability only on Santucci's counterclaim against the Village, this appeal followed.

On appeal, the Village contends: (1) the trial court improperly found as a matter of law that Santucci's admitted breach was not a material breach entitling the Village to terminate the contract; (2) the trial court improperly held, as a matter of law, that the Village had no right to terminate the contract for Santucci's breach of section 27 dealing with payments to subcontractors and suppliers; (3) the trial court erred in finding that Aetna's liability to the Village could not exceed the penal amount of Aetna's performance bond; (4) the trial court erred in finding that the Village was not a third-party beneficiary of the contract between Aetna and Santucci; (5) the trial court erred in finding that counts IIA and IV, the fraud allegations, were barred by the statute of limitations and in granting summary judgment against the Village on the issue of fraud; and (6) the trial court improperly found that the Village waived the liquidated damages provision of its contract with respect to Aetna's completion of the Knollwood and Wildwood sections of the water and sewer project; and (7) the trial court erred in failing to grant the Village's motion for summary judgment.

In its first contention the Village argues that the trial court improperly found, as a matter of law, that Santucci's admitted breach was not a material breach entitling the Village to terminate the contract. Additionally, the Village maintains that the court erred in finding that the Village did not insist upon strict compliance with section 27 of the contract prior to the notice of termination.

For a party to terminate a contract, the nonperformance or breach by the other party must be substantial or material. (*First National Bank v. Chrysler Realty Corp.* (1988), 168 Ill. App. 3d 784, 793.) The test is whether the breach is so substantial and fundamental as to defeat the objects of the parties in making the agreement, or

whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement. (168 Ill. App. 3d at 793.) The breach must be so material and important as to justify the injured party in regarding the whole transaction as at an end. 168 Ill. App. 3d at 793; *C.G. Caster Co. v. Regan* (1980), 88 Ill. App. 3d 280, 285, quoting A. Corbin, Contracts §946, at 925 (1952).

In the instant case the Village claimed that Santucci had breached section 27 of the contract between the Village and Santucci by failing to pay certain suppliers and subcontractors in a timely manner. Section 27 required Santucci to pay its suppliers up to the extent of 90% of the cost thereof not later than the 20th day of the month following that in which the materials were delivered to the site and its subcontractors not later than the fifth day of the month following that in which work was performed.

The record indicates that the amount Santucci was in default on the date of the Village's notice of termination was $223,528 (the total amount set forth in the 19 letters from subcontractors which were attached to the notice of termination); or $274,700 (the total of all checks and drafts payable to suppliers or subcontractors held on August 8, 1978, the date of the notice of termination); or $168,066.82 (the total amount due suppliers, according to a schedule prepared by Jack Russell, Santucci's accountant, on August 22, 1978, the date Santucci was terminated); or $59,050.48 (the amount set forth in Russell's affidavit filed in support of Santucci's motion for summary judgment).

Upon reconsideration of its prior finding that the question of Santucci's alleged breach was a genuine issue of material fact, the court found that Santucci's breach amounted to "some $59,000 plus" and that this amount was not a material breach. The court found, therefore, that there was no question of genuine fact concerning this issue. Although the court relied on its consideration of the pleadings before it to determine that the breach was only "$59,000 plus," we find from our review of these same pleadings that a genuine conflict existed regarding the amount Santucci was in default at the time of the notice of termination. Nevertheless, we find that none of the amounts cited above could be deemed a material breach in light of the total contract price of $2,491,906.75.

The Village contends, however, that the materiality of the breach is irrelevant because section 23 of the contract between the Village and Santucci provides that the contract can be terminated by the Village "in the event that *any* of the provisions of this contract are violated by the Contractor." (Emphasis added.) Santucci admitted to a

violation of section 27 in the amount of $59,050.48. Under section 23 and by Santucci's admission, it appears then that the Village was justified in terminating the contract, regardless of whether Santucci's breach was a material one.

Santucci argues that its failure to timely pay certain subcontractors and suppliers cannot be considered a breach since the Village had never insisted upon strict compliance with section 27 and had, in fact, agreed that Santucci did not have to adhere to the provisions of that section. Santucci bases this argument on three pieces of allegedly undisputed evidence: (1) a February 16, 1978, letter from Baxter & Woodman, the Village engineers, to the Village board of trustees; (2) the affidavit of Jack Russell, Santucci's accountant; and (3) the deposition of Otto Larsen, Baxter & Woodman's chief engineer on the water and sewer project.

In its letter of February 16, 1978, Baxter & Woodman set forth, that as of February 9, 1978, Santucci had $109,933.45 in unpaid accounts with various subcontractors and suppliers but that Baxter & Woodman was satisfied that Santucci would make timely payments as work progressed *and* submit waivers of lien or cancelled checks as evidence of payment. (The Village had required such evidence of payments since November 1977, when the Village had learned that Santucci was delinquent in paying certain subcontractors and suppliers.) In its letter Baxter & Woodman also recommended payment of Santucci's pay requests 18 and 19 on which the Village had withheld payment because of Santucci's prior failure to furnish evidence of payment to certain subcontractors and suppliers. Santucci maintains that the February 16, 1978, letter shows that the Village no longer was requiring strict compliance with section 27 from Santucci. We note, however, that Baxter & Woodman recommended payment because Santucci had provided evidence of past payments approximating $550,000 and because the Village was secured by a contract retainage provision and the Aetna performance bond. We do not believe the letter indicates that Santucci need no longer comply with the time and percentage provisions set forth in section 27.

Santucci also maintains that Jack Russell's affidavit evidences that the Village had relinquished right to compliance with section 27. In his affidavit, Russell states that at a meeting on February 9, 1978, at which he was present, the Village attorney, Julius Abler, learned that Baxter & Woodman had consistently refused to pay Santucci for on-site materials as provided in section 25(b) of the contract. Russell stated that, upon discovering this fact, Abler indicated that the Village would no longer strictly enforce the time and percentage limita-

tions of section 27 relating to Santucci's supplier payments. According to Russell, Santucci subsequently received a copy of a letter from Baxter & Woodman to the Village which Russell understood to be a confirmation of his understanding that these limitations would not thereafter be strictly enforced. Based on this understanding, Russell scheduled payments to suppliers. It was Russell's opinion that his failure to timely pay suppliers did not cause any shortage of materials or supplies sufficient to threaten Santucci's performance of the contract work.

Otto Larsen's deposition states that Baxter & Woodman knew as early as September 27, 1976, that, under the provisions of section 27, Santucci was behind in paying its subcontractors and suppliers. Rather than demanding strict compliance with section 27, Larsen stated that the Village required Santucci to provide it with cancelled checks as proof of payment.

Although Santucci maintains that these three pieces of evidence show that the Village did not require strict compliance with the time and percentage provisions of section 27 of the contract and, therefore, there could be no breach of section 27, we also believe they contained facts which allow for more than one conclusion or inference, *e.g.*, was the Village's failure to require strict compliance of section 27 based strictly on Santucci's consistent evidence of payment of subcontractors and suppliers with each pay request to the Village.

Although summary judgment is an appropriate procedure in construing the legal principles of a contract (*Village of Rosemont v. Lentin Lumber Co.* (1986), 144 Ill. App. 3d 651, 659), it is a remedy to be awarded with caution in view of its drastic nature, and it should be granted only when the parties' right to it is clear and free from doubt. (*Stringer Construction Co. v. La Grange State Bank* (1984), 148 Ill. App. 3d 621, 625.) If the facts allow for more than one conclusion or inference, as they do here, the motion for summary judgment should be denied. (*Amin v. Knape & Vogt Co.* (1986), 148 Ill. App. 3d 1075, 1077.) From the facts presented in the documents in the record before us, we find that summary judgment based solely on the "materiality" of Santucci's breach was improper.

Next, the Village contends that the trial court improperly held, as a matter of law, that the Village had no right to terminate the contract for Santucci's breach of section 27. The court found that the sole remedy for breach of section 27 was set forth in section 25(d) of the contract and did not include termination of the contract. We note that in its earlier order the court had determined that a genuine issue of material fact existed regarding whether the Village could terminate

its contract with Santucci for Santucci's failure to timely pay subcontractors and suppliers. We agree with this prior order and find the court's decision upon reconsideration to be erroneous.

■ The trial court's latter judgment had three bases: (1) rules of construction require that specific language of a contract controls over general; (2) ambiguities are construed against the preparer of the contract; and (3) forfeitures are abhorred. The relevant portions of the contract between the Village and Santucci in determining the issue of the Village's remedies for breaches of the contract are sections 19, 23, 25(d) and 27.

Section 19 provides in relevant part:

"It is further agreed that time is of the essence of each and every portion of this contract and of the specifications wherein a definite and certain length of time is fixed for the performance of any act whatsoever and where under the contract an additional time is allowed for the completion of any work, the new time limit fixed by such extension shall be of the essence of this contract."

Section 23 provides:

"In the event that any of the provisions of this contract are violated by the Contractor, or by any of his subcontractors, the Owner may serve written notice upon the Contractor and the Surety of its intention to terminate the contract, such notices to contain the reasons for such intention to terminate the contract and unless within ten (10) days after the serving of such notice upon the Contractor, such violation or delay shall cease and satisfactory arrangement of correction be made, the contract shall, upon the expiration of said ten (10) days, cease and terminate. In the event of any such termination, the Owner shall immediately serve notice thereof upon the Surety and the Contractor and the Surety shall have the right to take over and perform the contract. Provided, however, that if the Surety does not commence performance thereof within ten (10) days from the date of the mailing to such Surety of notice of termination, the Owner may take over the work and prosecute the same to completion by contract or by force account for the account and at the expense of the Contractor and the Contractor and his Surety shall be liable to the Owner for any excess cost occasioned the Owner thereby, and in such event the Owner may take possession of and utilize in completing the work, such materials, appliances, and plant as may be on the site of the work and necessary therefor."

Section 25(d) provides:

"The Contractor agrees that he will indemnify and save the Owner harmless from all claims growing out of the lawful demands of subcontractors, laborers, workmen, mechanics, materialmen, and furnishers of machinery and parts thereof, equipment, power tools, and all supplies including commissary, incurred in the furtherance of the performance of this contract. The Contractor shall, at the Owner's request, furnish satisfactory evidence that all obligations of the nature hereinabove designated have been paid, discharged, or waived. If the Contractor fails so to do, then the Owner may, after having served written notice on the said Contract or, either pay unpaid bills, of which the Owner has written notice, direct, or withhold from the Contractor's unpaid compensation a sum of money deemed reasonably sufficient to pay any and all such lawful claims until satisfactory evidence is furnished that all liabilities have been fully discharged whereupon payment to the contractor shall be resumed, in accordance with the terms of this contract, but in no event shall the provisions of this sentence be construed to impose any obligations upon the Owner to either the Contractor or his Surety. In paying any unpaid bills of the Contractor, the Owner shall be deemed the agent of the Contractor, and any payment so made by the Owner shall be considered as a payment made under the contract by the Owner to the Contractor and the Owner shall not be liable to the Contractor for any such payments made in good faith."

Section 27 provides:

"The Contractor shall pay (a) for all transportation and utility services not later than the 29th day of the calendar month following that in which services are rendered, (b) for all materials, tools, and other expendable equipment to the extent of ninety percent (90%) of the cost thereof, not later than the 20th day of the calendar month following that in which such materials, tools, and equipment are delivered at the sit [*sic*] of the project, and the balance of the cost thereof, not later than the 39th day following the completion of that part of the work in or on which such materials, tools, and equipment are incorporated or used, and (c) to each of his subcontractors, not later than the 5th day following each payment to the Contractor, the respective amounts allowed the Contractor on account of the work performed by his subcontractors to the extent of each subcontractor's interest therein."

■ When the language of a contract is unambiguous, the express provisions govern, and there is no need for construction or inquiry as to the intentions of the parties. (*Gadsby v. Health Insurance Administration, Inc.* (1988), 168 Ill. App. 3d 460, 469.) Whether an ambiguity exists is a question of law and will be found if the language used in a contract is reasonably acceptable to more than one meaning. (168 Ill. App. 3d at 469.) Contracts should be considered as a whole, giving meaning and effect to each provision thereof. *Srivastava v. Russell's Barbecue, Inc.* (1988), 168 Ill. App. 3d 726, 730.

■ Keeping these principles in mind, we do not find, as Santucci asserts, that section 23 and section 25(d) are in conflict or create an ambiguity. Rather, from our careful reading of these sections we determine that section 25(d) must be read in conjunction with section 23. Section 25(d) provides that if the contractor (Santucci) fails to furnish the owner (the Village) with satisfactory evidence that the claims of subcontractors and suppliers have been paid, discharged, or waived, the owner, after having served written notice on the contractor, may either pay unpaid bills or withhold from the contractor's unpaid compensation a sum of money reasonably sufficient to pay the claims until satisfactory evidence is furnished that all liabilities have been fully discharged whereupon payment to the contractor shall be resumed. Section 23 provides that the owner may serve written notice of termination of the contract upon the contractor, for breach of *any* of the provisions of the contract, and upon termination, either the Surety for the contractor or the owner may take over and perform the contract.

From our review of the record, we determine that the Village first complied with the provisions of section 25(d) before resorting to the remedy provided in section 23. The evidence shows that after learning that Santucci had been delinquent, since at least August 1977, in paying bills from certain subcontractors and suppliers, the Village wrote Santucci, pursuant to section 25(d), and requested evidence of payment to these parties. The Village withheld payment on certain pay requests by Santucci until the Village had evidence that Santucci had met its obligations.

Approximately eight months later, the Village resorted to section 23, serving upon Santucci a written notice of termination of the contract accompanied by letters from 19 subcontractors and suppliers, written between November 1977 and July 1978, demanding the payment of amounts due. In some instances, the letters threatened no further performance of work or provision of supplies for the project until payment was made. We infer from these attached letters and the

Village's notice to terminate that Santucci continued to be delinquent in its payments and that it was this continued delinquency which led to the Village's application of the provisions of section 23.

■ We believe the trial court erred in finding that section 25(d) provided the only remedy for Santucci's unpaid bills. Section 23 provided a further remedy for the Village. The question remains, however, whether Santucci's delinquency in paying certain suppliers and subcontractors, in fact, constituted a breach or whether the Village's termination of the contract was patently unfair due to the Village's alleged relinquishment of strict compliance by Santucci with the provisions of section 27. The facts surrounding this issue allow for more than one conclusion or inference and, therefore, summary judgment should have been denied. (*Amin v. Knape & Vogt Co.*, 148 Ill. App. 3d at 1077.) Moreover, grant of summary judgment was particularly inappropriate on this issue since the trial court based the summary judgment on its conclusion that the only remedy available to the Village in this instance was found in section 25(d).

In its third contention the Village argues that the trial court erred in finding that Aetna's liability to the Village did not exceed the penal amount of Aetna's performance bond since Aetna did not effectively reserve its rights to be obligated for no more than the bond penalty. We agree.

■ Every contractor in Illinois who enters into a contract with a public entity to do public construction work is required to furnish a bond to the public entity assuring that the work will be completed and all obligations will be fulfilled. (Ill. Rev. Stat. 1975, ch. 29, par. 15; *Board of Education v. Hartford Accident & Indemnity Co.* (1987), 152 Ill. App. 3d 745, 748.) Additionally, section 1 of the Bond for Public Works Act also requires that the following language be incorporated into every bond secured for public construction work whether the provisions are inserted in such bond or not:

> " 'The principal and sureties on this bond agree that all the undertakings, covenants, terms, conditions and agreements of the contract or contracts entered into between the principal and the State or any political subdivision thereof will be performed and fulfilled and to pay all persons, firms and corporations having contracts with the principal or with subcontractors, all just claims due them under the provisions of such contracts for labor performed or materials furnished in the performance of the contract on account of which this bond is given, when such claims are not satisfied out of the contract price of the contract on account of which this bond is given, af-

ter final settlement between the officer, board, commission or agent of the State or of any political subdivision thereof and the principal has been made.' " Ill. Rev. Stat. 1975, ch. 29, par. 15.

*Hartford,* 152 Ill. App. 3d at 748.

■ When a bond incorporates by reference a construction contract, as section 1 above requires, the provisions of the contract are provisions of the bond. (*Fisher v. Fidelity & Deposit Co.* (1984), 125 Ill. App. 3d 632, 639.) Consequently, in the case at bar section 23 of the construction contract was incorporated by reference into the performance bond. Section 23, which deals with the right of the owner (the Village) to terminate the contract provides:

"In the event that any of the provisions of this contract are violated by the Contractor, or by any of his subcontractors, the Owner may serve written notice upon the Contractor and the Surety of its intention to terminate the contract, such notices to contain the reasons for such intention to terminate the contract, and unless within ten (10) days after serving of such notice upon the Contractor, such violation or delay shall cease and satisfactory arrangement of correction be made, the contract shall, upon expiration of said ten (10) days, cease and terminate. In the event of any such termination, the Owner shall immediately serve notice thereof upon the Surety and the Contractor and the Surety shall have the right to take over and perform the contract. Provided, however, that if the Surety does not commence performance thereof within ten (10) days from the date of the mailing to such Surety of notice of termination, the Owner may take over the work and prosecute the same to completion by contract or by force account for the account and at the expense of the Contractor and the Contractor and his Surety shall be liable to the Owner for any excess cost occasioned the Owner thereby, and in such event the Owner may take possession of and utilize in completing the work, such materials, appliances, and plant as may be on the site of the work and necessary therefor."

Under this contract provision, Aetna had two alternatives when the Village terminated Santucci's contract: "take over and perform the contract" or refrain from performing and allow the Village to take over the work and complete the contract. If Aetna chose the latter alternative, it would, under the terms of section 23, be liable for any excess costs, *i.e.,* Aetna would be liable for more than the amount of the penal bond. If Aetna chose the first alternative, it might like-

wise be liable for more than the penal bond if, in performing the contract, the cost of the performance totaled more than the sum of the bond.

Despite the clear language of section 23 of the contract, Aetna, relying primarily on case law from other jurisdictions, argues that if an owner elects to complete the construction work, the surety's liability is limited to the penal sum of the bond. If the surety elects to perform the work, it puts itself in the place of the contractor and becomes liable for the cost to complete the work regardless of the amount of the bond.

▮ Aetna maintains that it did not take over Santucci's role when it agreed to perform construction work. Rather, it relies on its letter of September 19, 1978, to the Village to maintain that it took over the contract and completed it as though the Village itself undertook the completion of the contract. In that letter, Aetna informed the Village that Aetna would undertake performance of Santucci's contract subject to the following conditions:

(a) that Aetna in taking over Santucci's contract would not be waiving any rights which it may have if it was subsequently determined that Santucci was correct in its contention that the termination was unlawful; and

(b) that all of the rights of both Aetna and Santucci, including whatever right Aetna may have to additional compensation in the event that the Village's termination of Santucci's contract was found to be without legal justification would be expressly preserved as though Aetna did not exercise its right to complete and, instead, the Village undertook completion of said contract.

According to Aetna, the reservation of its rights as set forth in this letter proves it did not take over Santucci's role but, instead, elected to complete the construction work as if the Village itself were completing it. Therefore, Aetna argues, acting as the owner in this situation, Aetna's liability was limited to the penal sum of the bond. We, however, fail to glean that particular interpretation from the language of Aetna's letter. Contrary to Aetna's position here and in the trial court, we do not believe Aetna's reservation of rights pertained to any limitation in its liability to perform the contract. Rather, according to Aetna's letter, Aetna is reserving its rights to indemnification in the event that Santucci was wrongfully terminated. This conclusion is admitted by Aetna in its brief.

▮ ▮ Nevertheless, even if by its reservation of rights Aetna was reserving its right to be liable to the Village only in the amount

of the performance bond, that reservation constituted a modification of section 23 of the contract for which there was no consideration. Aetna asserts that its agreement to perform the construction work was consideration for the Village's agreement to allow Aetna's reservation of rights. However, under the terms of the contract, which have been shown to be part of the performance bond, Aetna was already obligated to perform the work. A promise to do something which one is already legally obligated to do is no consideration and creates no new obligation. (*Carroon & Black of Illinois, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 162; *Libertyville Township v. Woodbury* (1984), 121 Ill. App. 3d 587, 592.) Here, the benefit derived from Aetna's attempted modification of the contract was unilateral, inuring to the benefit of Aetna only. The Village gained nothing, and, consequently, there was no modification of the contract since consideration was lacking.

■ Finally, we note that although Aetna argues it never undertook to complete the construction project, it admits in its counterclaim and third-party complaint filed against Santucci that it took over completion of the project. However, in its counterclaim against the Village, Aetna states it undertook completion of the contract only to the extent of the penalty bond. In this same counterclaim, Aetna also states that it was instructed by the Village to perform work not included in Santucci's contract. If this allegation is true and if it was this additional work which Aetna foresaw would cause the cost of the project to exceed the penal sum, then Aetna may have been justified in refusing to perform in excess of the sum of the bond. This, however, is a factual question, as is the determination of which admission in the counterclaim mentioned above constituted the truth.

As genuine issues of material fact existed concerning the issue of the extent of Aetna's liability under the performance bond, we find that the trial court erred in granting summary judgment in Aetna's favor on this issue.

The Village next contends that the trial court erred in finding that the Village was not a third-party beneficiary of the contract between Aetna and Santucci.

In count III of its amended complaint the Village alleged that it was the third-party beneficiary to the September 1978 agreement between Aetna and Santucci wherein Aetna agreed to complete the water and sewer project for Santucci. The Village sought damages due to Aetna's instruction to CVS, the contractor hired subsequent to Santucci, to cease work in June 1980, although the construction project was unfinished.

In his memorandum opinion, the trial judge found that no third-party beneficiary situation was formed in the original contract nor was Aetna hired by Santucci to complete the contract. It was the judge's finding that the Village was not a third-party beneficiary of the agreement between Aetna and Santucci.

■■ One is a third-party beneficiary of a contractual provision if the parties to a contract, or at least the promisee (here Santucci), intended that the agreement confer a benefit on the third-party. (*Bates & Rogers Construction Corp. v. Greeley & Hansen* (1985), 109 Ill. 2d 225, 232.) A third-party beneficiary may sue under a contract made for his benefit. (*Santucci Construction Co. v. Baxter & Woodman, Inc.* (1986), 151 Ill. App. 3d 547, 556.) The test, however, is whether the benefit to the third person is direct to him or is an incidental benefit to him arising from the contract, and he has a right to sue on the contract only if the benefit is direct. (151 Ill. App. 3d at 556.) Whether the benefit was directly intended for the third party must be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution. *Board of Education v. Hartford Accident & Indemnity Co.* (1987), 152 Ill. App. 3d 745, 753.

As we have previously mentioned in this disposition, in Illinois every contractor who enters into a contract with a public entity to do public construction work must furnish a bond to the public entity assuring that the work will be completed and all obligations will be fulfilled. (Ill. Rev. Stat. 1975, ch. 29, par. 15; *Hartford,* 152 Ill. App. 3d at 748.) In essence, all the obligations placed on the contractor by the terms of the contract must be undertaken and completed by the surety of the bond in the event that the contractor cannot or does not complete its obligations under the contract. 152 Ill. App. 3d at 749.

In the instant case, Santucci contracted with the Village to improve the Village's water and sewer facilities. At the same time, Santucci, as required by law, entered into an agreement with Aetna in the form of a performance bond. That bond provided that Aetna would perform the work that Santucci was to perform for the Village if, for some reason, Santucci could not complete its obligations under the contract. The bond was in the amount the Village agreed to pay Santucci for the water and sewer project.

■■ If by the terms of the promise for which the promisee (Santucci) bargained the promisor (Aetna) is to render a performance directly to the third-party (the Village), in nearly every case the third-party who is to receive performance will be the person intended by the promisee to be benefited thereby. (L. Simpson, Contracts §117, at

247 (2d ed. 1965).) Under the circumstances presented here, Santucci made an agreement with Aetna that Aetna would assure performance of the construction work for the Village. Santucci intended that the Village would directly benefit from the performance bond and, thus, the Village was a third-party beneficiary to the contract between Aetna and Santucci. We conclude that the trial court erred in not finding that the Village was the third-party beneficiary of the agreement between Santucci and Aetna.

 Next, the Village argues that the trial court erred in finding that counts IIA and IV, the fraud allegations, were barred by the statute of limitations and in granting summary judgment against the Village and in favor of Santucci on the issue of fraud.

Count IIA of the Village's complaint alleged that Santucci, through its agent Ventrella, committed a fraud against the Village by submitting false affidavits connected to pay requests submitted to the Village and, thus, breached the contract between the parties. Count IV alleged the tort of fraud against Santucci and Ventrella, individually.

The Village maintains that the proper limitations section for count IIA is section 13—206 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 13—206), which provides a 10-year limitation for an action on a written contract. For count IV the Village asserts that section 13—205 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 13—205), which provides that "all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued" is the proper limitations section.

The court, however, in reaching its finding that both counts were barred by the statute of limitations relied on section 13—214(a) of the Code of Civil Procedure. (Ill. Rev. Stat. 1985, ch. 110, par. 13—214(a).) That section, which deals with "[a]ctions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction," provides that such action "shall be commenced within 4 years from the time the person bringing an action *** knew or should reasonably have known of such act or omission." (Ill. Rev. Stat. 1985, ch. 110, par. 13—214(a).) Because evidence showed that the Village knew Santucci was not paying suppliers as early as September 27, 1976, the court concluded that count IV, filed on June 22, 1983, and count IIA filed on November 21, 1983, were barred by the four-year statute of limitations.

Although we agree with the trial court that section 13—214 is the appropriate statute to consider in this case in determining if the Vil-

lage's claims in count IIA and count IV were timely filed, we find that the trial court erred in finding that the two counts were barred. The four-year limitations period set forth in subparagraph (a) of section 13—214 was inapplicable to count IIA and count IV. Subparagraph (e) of that same section states:

> "The limitations of this Section shall not apply to causes of action arising out of fraudulent misrepresentations or to fraudulent concealment of causes of action." (Ill. Rev. Stat. 1983, ch. 110, par. 13—214(e).)

As counts IIA and IV arose out of the alleged misrepresentations by Santucci and its agent Ventrella that suppliers had been paid when, in fact, some had not, the court erred in finding that these counts were barred by the four-year period of limitations set forth in section 13—214(a). The fact that the actual limitations period in effect at the time counts IIA and IV were filed was two years rather than four years (see Ill. Rev. Stat. 1983, ch. 110, par. 13—214(a)) is inconsequential to the result we reach here.

Having found that the Village's fraud counts were not barred by the statute of limitations, we next address the Village's contention that the trial court erred in ruling in Santucci's favor on the issue of fraud.

██ The Village claims that certain sworn contractor's affidavits submitted to the Village by Santucci, indicating that Santucci had paid its subcontractors, were fraudulent. To establish an action for fraud there must be: (1) a statement of material fact as opposed to opinion; (2) the statement must be untrue; (3) the party making the statement knows or believes it to be untrue; (4) the person to whom the statement is made believed and relied on it and had a right to do so; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance of the person to whom the statement was made led to his injury. (*Brown v. Broadway Perryville Lumber Co.* (1987), 156 Ill. App. 3d 16, 23.) Ordinarily, whether these elements have been adequately proven is a question of fact for the trier of fact. (156 Ill. App. 3d at 23.) But, where a case presents no genuine issue of material fact and requires only the application of recognized legal principals to an agreed factual situation, summary judgment is appropriate. *Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 479.

In the instant case, the Village argues that the affidavits of Angelo Ventrella, Santucci's vice-president, and Jack Russell, Santucci's accountant, filed in support of Santucci's motion for partial summary judgment, fail to establish that Santucci had no knowledge of

the alleged falsehoods contained in the affidavits accompanying the monthly pay requests submitted to the Village. To support its argument, the Village makes the general statement that "facts" sworn to by Ventrella in his affidavit are in reality his own subjective opinions and his state of mind. However, the Village provides no specific example from Ventrella's affidavit to illustrate Ventrella's alleged subjective state of mind. Furthermore, having failed to file any counteraffidavits, the Village relies in this court, as it did in the trial court, upon specific allegations of fraud in its complaint to illustrate that a question of fact existed on the issue of fraud.

 ■ Where facts contained in an affidavit in support of summary judgment are not contradicted by a counteraffidavit, such facts are admitted and must be taken as true. (*Beals v. Huffman* (1986), 146 Ill. App. 3d 30, 39.) Absent facts set out in a counteraffidavit, mere reliance upon contrary averments in an opposing party's pleadings is insufficient to raise an issue of material fact on the summary judgment motion. (*Erickson v. Board of Education* (1983), 120 Ill. App. 3d 264, 266.) Here, contradictory assertions in the Village's pleadings were not sufficient to overcome the affidavits of Russell and Ventrella. In his affidavit Jack Russell, Santucci's bookkeeper, stated that in preparing the affidavits to accompany Santucci's pay requests, he believed these affidavits to be correct at the time of their preparation. He based this belief on the fact that Santucci's running inventories showing the gross value of materials stored at the jobsite, but not yet used in the work, always exceeded, from time to time, total amounts owed to Santucci's suppliers. Russell stated that he prepared the affidavits for the execution of Angelo Ventrella, Santucci's vice-president. Both Russell and Ventrella set forth in their affidavits that Ventrella relied upon the accuracy of the figures presented to Ventrella by Russell since it was Russell's job to prepare those figures.

Additionally, Ventrella stated in his affidavit that at no time in signing the affidavit submitted with the pay requests did he sign with any knowledge concerning their lack of accuracy or with any intent to deceive the Village into making payments called for in the pay requests. Ventrella stated that he signed only with the advice of Russell, that the pay requests were accurate in all respects, including statements therein contained that suppliers had been paid for and supplies used in the work. Thus, the only substantial evidence in the record pertaining to Ventrella's alleged knowledge of the falsity of the affidavits accompanying the pay requests or his intent to deceive the Village by the use of the affidavits shows that all the elements necessary for establishing an action of fraud did not exist. Given the substance

of Russell's and Ventrella's affidavits and the Village's failure to provide evidence of an issue of material fact on fraud, we find that the trial court was correct in granting summary judgment in favor of Santucci and Ventrella on the issue of fraud.

Next, the Village argues that the trial court erred in finding that the Village waived the liquidated damages provision of its contract with respect to Aetna's completion of the Knollwood and Wildwood sections of the water and sewer project. It is the Village's position that the waiver constituted a modification of the contract which must fail because of lack of consideration.

■■ Waiver is the intentional relinquishment of a known right demonstrated by words or by conduct or inferred from delay in asserting a right. (*UIDC Management, Inc. v. Sears, Roebuck & Co.* (1988), 167 Ill. App. 3d 81, 84.) To be considered a waiver the acts must be inconsistent with an intention to insist upon the right and must show an intentional relinquishment of that right. (167 Ill. App. 3d at 84.) In light of these propositions of law, we agree with the trial court's conclusion in its memorandum opinion filed in support of its December 21, 1987, judgment order that, "In the case at bar, the clearest demonstration of a waiver exists."

The documents which appear in the record show that the contract between Santucci and the Village originally called for the installation of sewer and water lines in the Knollwood and Wildwood areas of the Village. However, in a letter dated November 16, 1978, Baxter & Woodman, the Village engineers, informed Aetna that the work in those areas would be completed only if the Village could secure waivers, absolving the Village of any liability for damages caused by the construction of the sanitary sewers, from the property owners in the Knollwood and Wildwood areas. On June 28, 1979, without any mention regarding whether the waivers had been secured, the Village engineers informed Aetna of the Village's desire that work in the Knollwood and Wildwood sections be commenced.

In its letter of July 20, 1979, Aetna expressed its reluctance to perform any work in the areas since such performance would expose Aetna to possible claims by property owners if the dewatering in the areas caused property damage. Aetna referred to prior statements by the Village that the Village would obtain releases from all residents in the area before commencing any work there. Aetna asked the Village to furnish Aetna with copies of releases. On August 6, 1979, Baxter & Woodman notified Aetna that the Village had not obtained any releases of property damage liability from homeowners in the Knollwood and Wildwood areas.

In his affidavit filed with Aetna's response to the Village's motion to strike Aetna's affirmative defense to count II, Robert Balmer, a bond claims supervisor for Aetna, stated that in mid-November 1979, he met with the Village and Baxter & Woodman to express Aetna's unwillingness to proceed with construction in the Knollwood and Wildwood areas unless the Village agreed to indemnify Aetna against any claims which might be made against Aetna by residents of the areas. Balmer also pointed out to the Village that Aetna's performance of Santucci's contract had been delayed by its inability to work in those areas. According to Balmer, the Village attorney, Julius Abler, stated that if Aetna would proceed with construction in the areas, the Village would waive whatever right it had to liquidated damages against Aetna and Santucci. This waiver was formally adopted by majority vote of the Village board of trustees at its November 19, 1979, meeting. Clearly, this act by the Village board of trustees evidenced an intentional relinquishment by the Village of its right to be awarded liquidated damages for any delay in the completion of the work embraced in the contract.

■■ The Village claims that the waiver of the liquidated damages clause did not constitute a modification of the contract because it was not supported by consideration. We disagree, as in both Aetna's affirmative defense to the Village's count II and in Aetna's answer to the Village's second set of interrogatories, Aetna stated that in consideration for the Village's waiver of the liquidated damages clause Aetna agreed to proceed, without contest, with the construction project in the Knollwood and Wildwood areas. By agreeing to proceed without contest, Aetna surrendered its right to seek indemnification from the Village for any claims by property owners for damages which the Village itself had feared could occur as a result of the construction project in the Knollwood and Wildwood areas. We consider the surrender of this right to constitute adequate consideration for the modification of the contract.

We conclude that the Village freely and voluntarily waived its right to liquidated damages and that the waiver was supported by consideration. Accordingly, summary judgment was proper on this issue.

Last, the Village contends that the trial court erred in failing to grant the Village's motion for summary judgment. The defendants respond that a denial of a summary judgment motion is not an appealable order.

■■ Ordinarily, a denial of a motion for summary judgment is not immediately appealable because it is not a final or appealable order.

(*In re Application of Busse* (1986), 145 Ill. App. 3d 530, 536.) However, when, as in this case the trial court granted defendants' summary judgment motions and denied plaintiff's motion, the resulting order became final and appealable because it entirely disposed of the litigation. *Duldulao v. St. Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 494.

■■■ In the instant case, the denial of the Village's summary judgment motion was a final and appealable order. The trial court's order entered summary judgment in Aetna's favor on counts I, II, IIA, and III of the Village's amended complaint, in Santucci's favor on counts II, IIA and IV of the amended complaint, and in Ventrella's favor on count IV of the amended complaint. This order entirely disposed of the litigation and, consequently, constituted a final judgment for purposes of appeal.

Accordingly, we affirm the summary judgment order in part, reverse in part, and remand this cause for further proceedings consistent with the views expressed herein.

Affirmed in part; reversed in part and remanded.

NASH and REINHARD, JJ., concur.