2018 IL App (1st) 171844

No. 1-17-1844

Fourth Division
June 7, 2018

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| RADIANT STAR ENTERPRISES, L.L.C., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CH 15357 |
| | ) | The Honorable |
| METROPOLIS CONDOMINIUM ASSOCIATION, | ) ) | Michael T. Mullen, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal arises from cross-motions for summary judgment filed by plaintiff Radiant Star Enterprises, L.L.C., and defendant Metropolis Condominium Association and involves a single question: if a party has allegedly breached an arbitration clause with respect to one dispute, may that same party nevertheless demand arbitration on a different, unrelated, dispute? The trial court determined that it could under the language of the parties' arbitration agreement, granting summary judgment in favor of plaintiff and denying defendant's cross-motion for summary judgment. For the reasons that follow, we affirm the trial court's judgment.

¶ 2                                BACKGROUND

¶ 3                                I. Complaint

¶ 4        On October 19, 2015, plaintiff filed a complaint for declaratory judgment to enforce an arbitration clause, seeking a ruling that defendant was required to arbitrate a particular dispute between plaintiff and defendant. The complaint alleges that plaintiff and defendant were owners of portions of the building located at 8 West Monroe Street[1] in Chicago. The building was divided into three zones—the "Residential Parcel," the "Retail Parcel," and the "Office Parcel." Plaintiff owned the Office Parcel, while defendant represented the owners of the Residential Parcel, which was comprised of condominium units.[2] The Retail Parcel consisted of the first two floors of the building, the Office Parcel consisted of the third floor, and the Residential Parcel consisted of all floors from the fourth floor to the top of the building. The relationship between the respective owners was governed by a document entitled the "Reciprocal Easement and Operating Agreement" (REA). The complaint alleges that "[t]he Retail Owner and the Office Owner own their respective portions of the Building, but they are not members of the Defendant. Because it owns a large majority of the Building and controls most of the common elements and building systems, as a practical matter the Residential Owner, embodied in and represented by the Defendant, has more power and more responsibilities pursuant to the REA." The complaint alleges that plaintiff began its efforts to build out the Office Parcel for its business use in January 2013 and that the dispute between the parties was the result of defendant's interference with deliveries of mail, packages, and materials to the Office Parcel; access to the building's utilities and systems; and electronic access to the building's elevator systems.

---

[1]The record reflects that the building is also known by the address of 36 South State Street.
[2]The Retail Parcel is not at issue on appeal, and its owner is not a party to the instant litigation.

¶ 5        The complaint alleges that the REA required mandatory arbitration to resolve disputes between the parties, and on July 27, 2015, plaintiff made a formal demand for arbitration. However, on August 12, 2015, defendant responded, stating that it "reject[ed]" plaintiff's demand for arbitration. The sole count of the complaint was for declaratory judgment and sought a finding that the parties were bound by the terms of the REA and that defendant was obligated to arbitrate the dispute.

¶ 6        Attached to the complaint were excerpts from the REA, including article 13, which was entitled "Arbitration." Section 13.1 was entitled "Disputes Subject to Arbitration" and provided:

> "Each of the questions, differences, disputes, claims or controversies arising among or between Owners under this Agreement which shall not be resolved within forty five (45) days after it shall arise (or other such shorter or longer time period expressly provided herein), shall be submitted for arbitration (including, without limitation, any matter expressly made an Arbitrable Dispute or subject to arbitration under this ARTICLE 13 by the terms of this Agreement). Notwithstanding anything to the contrary herein, in no event shall any arbitration under this ARTICLE 13 result in the change in the respective cost sharing percentages set forth in this Agreement."

¶ 7        Section 13.2 was entitled "Arbitration Procedure" and set forth the procedure for arbitration proceedings. Under this section, "[i]n the event of an Arbitrable Dispute, any Owner involved in the Arbitrable Dispute shall have the right to commence arbitration by written notice to the other Owners." Within seven days of the delivery of the notice, each of the owners involved in the arbitration was required to appoint one attorney to represent the owner in connection with the dispute; the two owner attorneys then collectively appointed

3

one independent attorney and the three appointed attorneys comprised the arbitration panel. Within 30 days of the appointment of the third attorney, the arbitration panel was required to render its decision regarding the dispute. Section 13.2 also provided that "Owners may not seek injunctive relief in the arbitration." More importantly, section 13.2(f) provided:

> "The decision of the Panel, and any award of the Panel, shall be final, binding upon the Owners and unappealable, and judgment thereon shall be entered by any court of competent jurisdiction. Failure to comply with the decision of the Panel shall be deemed a default under this Agreement. Any award including payment of delinquent amounts shall include interest on such delinquent accounts at the rate set forth in *Section 12.4*."

¶ 8        Also attached to the complaint was a letter dated July 27, 2015, from plaintiff to defendant, exercising plaintiff's right to arbitration with respect to disputes concerning access to utilities, mail and package delivery, and elevator access. The letter also contained a copy of an airbill from FedEx, showing that the letter had been sent via overnight delivery on July 27, 2015.

¶ 9                                        II. Motion to Dismiss

¶ 10        On November 16, 2015, defendant filed a motion to dismiss the complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2014)), arguing that plaintiff had forfeited its right to rely on the REA's arbitration provision because plaintiff had failed to comply with a recent arbitration award, thereby expressly breaching the arbitration provision. Defendant argued that "[plaintiff's] breach constitutes a repudiation and default of that provision. As a result, [plaintiff] cannot enforce the arbitration

4

provision of the REA to compel arbitration of a new dispute. Therefore, its complaint to compel arbitration should be dismissed."

¶ 11    Defendant claimed that plaintiff and defendant had engaged in arbitration in March 2015 with respect to disputes concerning plaintiff's buildout of the Office Parcel and that an arbitration award had been entered on April 8, 2015. According to defendant, while defendant complied with the award, plaintiff did not. Instead, plaintiff filed a petition to vacate the award in federal district court and, when the district court confirmed the award, plaintiff filed an appeal to the Seventh Circuit Court of Appeals. When plaintiff sent a demand to arbitrate the new disputes, defendant advised plaintiff that plaintiff's refusal to comply with the earlier arbitration award was a breach of the arbitration provision and that defendant would not participate in any further arbitration proceedings until plaintiff complied with the earlier award.

¶ 12    Attached to the motion to dismiss was a copy of an arbitration award, dated April 6, 2015.[3] The award indicated that the panel considered four categories of potential breaches: (1) the sewer pipes; (2) the heating, ventilation, and air conditioning (HVAC) system; (3) the third-floor windows; and (4) ingress/egress. With respect to the issue of sewer pipes, the panel ordered that defendant was to obtain "a complete survey of all the ceiling pipes existing on the third floor, at [defendant's] own expense, and to provide the same to [plaintiff]. Then [defendant] must pay for the cost of any necessary repairs." With respect to the issue of the HVAC system, the panel found that defendant had no obligation to supply the

---

[3]The parties refer to the arbitration award throughout the litigation as being issued on April 8, as did the trial court below. However, the copy of the award contained in the record on appeal lists the date as April 6. As this is clearly the same arbitration award referenced by the parties, the slight discrepancy between the dates does not appear important.

Office Parcel with an HVAC system and that the cost of improvements to the Office Parcel belonged exclusively to plaintiff.

¶ 13    With respect to the issue of the windows, the panel noted that the REA "is not a drafting masterpiece" but that, pursuant to its terms, plaintiff bore the cost of repairing and replacing the windows and "the evidence is undisputed that the remaining not yet replaced third floor windows are hazardous and must be immediately replaced." Finally, with respect to the issue of ingress and egress, the panel found that defendant "failed to reasonably cooperate with [plaintiff] in developing an appropriate scaffolding and Traffic Plan, as required by both Articles 16.1(b)(viii) and 16.1(b)(ix) and Article 3.3. [Defendant] was obligated to cooperate pursuant to the REA as well as under the common law doctrine of good faith and fair dealing implied in any contract." The panel continued: "The panel thus orders that Metropolis Exhibit 24 is to be executed by both parties within seven (7) calendar days, from the date of the entry of this Award, and will be the Traffic Plan adopted for the remainder of the construction of the project."[4]

¶ 14    The panel also ordered defendant to "immediately send notice to the Alderman that [defendant] withdraws its objections to any of [plaintiff's] permits." Finally, the panel ordered that plaintiff "must commence to immediately thereafter, construct scaffolding on Monroe Street and then, replace the third floor windows, to provide safety to the public, as well as residents of the [building] and workers and delivery persons to this building. If [plaintiff] fails, for any reason, to complete this replacement of the windows, [defendant] shall do so and shall be entitled to payment by [plaintiff] pursuant to Exhibit 7.6(cc), plus

---

[4]"Metropolis Exhibit 24" is not included in the record on appeal.

interest accruing thereon." As a final matter, the panel found that both parties failed to establish any damages and declined to enter a monetary award to either party.

¶ 15        Also attached to the motion to dismiss was a copy of an August 24, 2015, order from the federal district court, denying plaintiff's petition to vacate the arbitration award and granting defendant's cross-motion to confirm the award, and a September 21, 2015, notice of appeal to the Seventh Circuit Court of Appeals.

¶ 16        In response to the motion to dismiss, plaintiff claimed that it had complied with the earlier arbitration award. It claimed that it replaced the third floor windows, installed its own HVAC system, and bore the costs of those improvements. Plaintiff further claimed that "[i]n the course of the project, deliveries were made in accordance with the City-issued permits and the essential terms of the Traffic Management Plan were followed, although [plaintiff] did not formally sign off on it." Plaintiff claimed that "[w]hether this compliance was sufficiently strict is beside the point, because with construction complete, the Award's requirement that 'the parties' 'sign and implement' the Traffic Management Plan 'for the remainder of the construction project' became moot." Furthermore, plaintiff claimed that defendant had actually failed to comply with the arbitration award because defendant had failed to properly repair the sewer lines, as it was required to do under the award. Finally, plaintiff claimed that its seeking judicial review of the arbitration award did not violate the REA and did not preclude further arbitrations because both Illinois and federal law permitted judicial review of "final and unappealable" arbitration awards. Plaintiff also claimed that any issues concerning the appealability of the award was nevertheless moot, because it had chosen to dismiss the federal appeal.

¶ 17　　　　Attached to the response was the affidavit of Duane Varan, plaintiff's principal, who averred that plaintiff complied with the arbitration award by replacing the third floor windows and installing its own HVAC system, both at its own expense. Varan averred that, with respect to the traffic management plan, "the Award required that [plaintiff] adopt the Traffic Management Plan 'for the remainder of the construction project.' [Plaintiff's] construction project is now complete, and there is no longer any need for a TMP. The proposed TMP was designed to address situations wherein construction deliveries would temporarily block access to the building's parking garage. The TMP issue has been mooted by the completion of [the] third floor build out." Varan further averred that the award required defendant to repair the sewer piping for the building, which it had not done. Varan averred that "[plaintiff] has registered complaints to [defendant] that the repairs undertaken by [defendant] to repair the sewer lines are shoddy, and that the [defendant's] sewer lines continue to leak. Despite these complaints, [defendant] has refused to repair the sewer lines, as ordered by the Award, at a time or times that do not interfere with [plaintiff's] business."

¶ 18　　　　In its reply in support of the motion to dismiss, defendant claimed, *inter alia*, that plaintiff had not replaced the windows as plaintiff claimed but "has replaced only the glass window panes in the Office Parcel. [Citation.] It has not replaced any of the other dilapidated window components as required by the April 8th award. [Citation.] Indeed, the failing frames, systems, joints, and seals remain on windows throughout the Office Parcel." Defendant also clarified that "[plaintiff's] *appeal* to the Seventh Circuit was precluded by the REA and therefore a material breach. [Citation.] [Defendant] does not argue that the REA's arbitration provision precludes all judicial review, as [plaintiff] suggests." (Emphasis in original.)

¶ 19      On May 26, 2016, the trial court denied defendant's motion to dismiss.

¶ 20                          III. Answer and Affirmative Defenses

¶ 21      On June 30, 2016, defendant filed its answer and affirmative defenses. Defendant raised three affirmative defenses. The first was for material breach and alleged that "[t]o date, [plaintiff] has failed to fully replace the Office Parcel Window Systems, as instructed by the arbitrators' April 8th award. It has thus failed to comply with that award and is in material breach of the REA's arbitration provision." Thus, defendant alleged that plaintiff was "precluded from invoking the arbitration provision of the REA to compel arbitration of new disputes while it materially breaches that provision." The second affirmative defense was for default and alleged that plaintiff had failed to comply with the arbitration award and "[i]nstead, [plaintiff] filed a petition to vacate the April 8th award in federal court," where the arbitration award was confirmed. Defendant alleged that plaintiff "cannot enforce the arbitration provision of the REA now to compel arbitration of new disputes while it is in default." The third affirmative defense was for estoppel and alleged that on February 19, 2016, plaintiff filed a lawsuit in the circuit court of Cook County, in which it requested the court to resolve certain disputes for which it had not sought arbitration. Defendant thus alleged that plaintiff was "estopped from asserting that the arbitration provision of the REA requires arbitration of all disputes between Building Owners."

¶ 22      On July 15, 2016, plaintiff filed an answer to defendant's affirmative defenses, in which it alleged that the arbitration award required plaintiff to replace the "windows," not the "window systems," as defendant alleged. Plaintiff also alleged that it had replaced the windows as required by the arbitration award. Plaintiff admitted that it had filed a lawsuit in the circuit court of Cook County, which sought a temporary restraining order with respect to

the issue of access to satellite TV facilities, and pointed to a provision in the REA indicating that owners were not permitted to seek injunctive relief in arbitration. Plaintiff further alleged that defendant consented to the jurisdiction of the court and that the case was resolved by the entry of an order negotiated between plaintiff and defendant, which occurred after the court had "specifically rejected [defendant's] argument that [plaintiff] was required to seek arbitration."

¶ 23                    IV. Motions for Summary Judgment

¶ 24                         A. Plaintiff's Motion

¶ 25    On August 3, 2016, plaintiff filed a motion for summary judgment, claiming that the instant dispute was arbitrable under the language of the REA, that plaintiff had "undisputedly" satisfied the conditions in the REA for arbitrating a dispute, and that defendant's affirmative defenses "have no factual or legal merit, and they are essentially the same as the arguments rejected by [the trial court] in denying the Motion to Dismiss."

¶ 26    Attached to the motion for summary judgment were a number of exhibits, including the report of Lyle Hill, the managing director of Keytech North America, a company that provided research and technical services focusing on the glass and metal industry. Hill's report was in the form of a December 16, 2014, letter to Adam Zarafshani of Panache Development & Construction, Inc. (Panache), plaintiff's general contractor, and provided:

> "In follow up of our meeting yesterday at the above referenced site, I want to go on record as stating that I feel the glass condition on the south elevation overlooking Monroe Street is extremely hazardous. I put a thickness meter on all of the glass that I could reach and the thickest of the readings that I got indicated that the glass is ¼-inch thick. None of the glass was labeled as being safety glass of any type and should

10

one of these lites break, anyone walking below at the time could potentially be seriously hurt. Minimally, a safety film should be applied to these pieces of glass as soon as possible. Ideally, a new framing system with safety glass would be installed providing both increased energy efficiencies as well as a much safer situation.

The fifth opening from the west on the south elevation (which has not been split with a division bar) is of primary concern to me. This piece of glass is approximately 122" wide by 129" in height and is a ¼-inch piece of monolithic annealed plate glass which doesn't even come close to complying with wind load requirements as per city code. While none of the glazed openings are adequately secure, this particular lite of glass which is over 100 square feet truly concerns me.

These glazed openings are simply *not safe*. My recommendation is that all of them be replaced with proper framing and glass that is in compliance with city code and common sense safety requirements.

Please feel free to contact me for further discussion on this or any other matter." (Emphasis in original.)

¶ 27    Also attached to the motion for summary judgment was a complete copy of the REA, several provisions of which are relevant to the case at bar. Article 1 of the REA contained definitions, and section 1.1(ff) defined the term "façade" as follows:

"The exterior walls of the Residential Parcel Improvements, the Office Parcel Improvements and/or the Retail Parcel Improvements, as the context may dictate, from the street level up to the Building roof, consisting of the terra cotta, pre-case cement materials and other facing materials, colonnades and the cornice at the top of the Building covering or attached to the concrete or steel structural supports forming

the curtain wall of the Building, window frames, window systems, joints and seals, but excluding (i) the Building roof and the roof structure, membrane, flashings and seals over the cornice; and (ii) the structural supports for the exterior wall of the Building."

¶ 28    Article 3 of the REA concerned easements burdening the Residential Parcel and provided that "[a]ny disputes concerning the existence, location, nature, use and scope of any of the Easements granted under this ARTICLE 3 shall constitute Arbitrable Disputes." Section 3.3 specifically concerned the grant of easements in favor of the Office Parcel. Section 3.3(a) granted:

> "*Ingress and Egress*. A non-exclusive easement for ingress and egress only for Persons, vehicles, material and equipment in, over, on, across and through such portions of the Residential Parcel as are reasonably necessary to: (i) permit the use, operation and Maintenance (but only if and when such Maintenance is required or permitted under this Agreement) of the Office Parcel, including, without limitation, the Office Owned Facilities and those portions of the Residential Parcel containing the access pathways to and from the Office Parcel and the loading dock, freight elevator, Trash Room and garbage dumpster referenced in *Section 3.3(d)* below, or (ii) perform (y) Alterations, pursuant to Article 16 hereof, and (z) restoration after damage or destruction, pursuant to Article 11 hereof, or condemnation, pursuant to Article 15 hereof."

Section 3.3(i) granted:

> "*Lobby, Elevators and Stairwells*. A non-exclusive easement for the Office Owners and its Permittees for the use of the elevators and stairwells located within the

Residential Parcel and for pedestrian ingress and egress over, upon, across and through the lobby for the Residential Parcel to and from the Monroe Street entrance to the Building from and to the Office Parcel."

¶ 29 Article 7 of the REA concerned "Services to Other Owners." Section 7.1 set forth "Services to the Office Owner by Residential Owner" and provided that:

"From and after the substantial completion of the Office Parcel Improvements, the Residential Owner shall furnish or cause to be furnished the following services to the Office Owner when, as, and if required or requested by the Office Owner:

* * *

(i) *Façade*. Maintenance of the Façade constituting a portion of the Office Parcel Improvements and washing of the exterior windows within the Office Parcel not fewer than three (3) times annually."

¶ 30 Article 11 of the REA concerned "Maintenance and Repair." Section 11.1 concerned "Maintenance of Residential Parcel Improvements, Office Parcel Improvements and Retail Parcel Improvements; [and] Restoration," and provided, in relevant part:

"Except as expressly provided in ARTICLE 7 hereof (and related Exhibits) relating to Maintenance of certain Facilities and areas of the Residential Parcel, Retail Parcel and Office Parcel, or hereinafter in this ARTICLE 11, the Residential Owner, Retail Owner and Office Owner shall, at their respective sole cost and expense, maintain and keep their respective Parcels and Improvements, including all Facilities located in their respective Parcels and Improvements and all Owned Facilities owned by such Owners, respectively, in good order and condition, comparable to other Class A 'first class' mixed-use residential condominium projects with associated parking in

13

downtown Chicago, and shall make all repairs or replacements of, in, on, under, within, upon or about such property, whether said repairs or replacements are to the interior or exterior thereof (including, without limitation, the Façade and the party wall (the 'Party Wall') located between the Property and the property located at 26-34 South State Street located adjacent to the Property to the north), or structural or non-structural components thereof, or involve ordinary or extraordinary repairs or replacements, necessary to keep the same in Class A 'first class' order and condition, howsoever the necessity or desirability thereof may arise, and whether or not necessitated by wear, tear, obsolescence, defects or otherwise."

¶ 31    Article 22 set forth a number of "General" provisions. Section 22.1 was entitled "Cooperation of Owners" and provided:

"In fulfilling obligations and exercising rights under this Agreement, each Owner shall cooperate with the other Owners to promote the efficient operation of each respective portion of the Improvements and the harmonious relationship among the Owners and to protect the value of each Owner's respective portion, estate or interest in the Land and Improvements. To that end, each Owner shall share information which it possesses relating to matters which are the subject of this Agreement, except such information as an Owner may reasonably deem confidential or privileged or which may be the subject of litigation or which such Owner is prohibited from revealing pursuant to court order. From time to time after the date hereof, each Owner shall furnish, execute and acknowledge, without charge (except where elsewhere provided herein) such other instruments, documents, materials and information as another Owner may reasonably request in order to confirm to such Requesting Owner

14

the benefits contemplated hereby, but only so long as any such request does not restrict or abridge the benefits granted the other Owners hereunder."

Section 22.17 was entitled "Default Shall Not Permit Termination of Agreement; No Rescission Without Unanimous Consent" and provided:

"No default under this Agreement shall entitle any party hereto to terminate, cancel or otherwise rescind this Agreement or any of the easements, terms or conditions set forth herein; provided, however, that this limitation shall not affect any other rights or remedies the parties hereto may have by reason of any default under this Agreement or any written amendment or supplement hereto. No party hereto may rescind this Agreement without the written consent of all of the Owners."

¶ 32    On August 9, 2016, defendant filed a request for discovery in connection with plaintiff's motion for summary judgment, requesting to depose Lyle Hill, plaintiff's window replacement expert, and to inspect the Office Parcel to determine what components of the window systems had been replaced. On August 11, 2016, the trial court entered and continued plaintiff's motion for summary judgment and defendant's motion for discovery, but ordered inspection of the Office Parcel windows to take place within 30 days. The record reflects that this inspection occurred on August 24, 2016.

¶ 33                    B. Defendant's Response/Cross-Motion

¶ 34    On March 22, 2017, defendant filed a combined cross-motion for summary judgment and response to plaintiff's motion for summary judgment,[5] in which defendant claimed that plaintiff had forfeited its right to invoke the arbitration provision of the REA because of its

---

[5]We note that defendant's motion for summary judgment does not appear in the record on appeal; the record only contains a "combined memorandum in support of its motion for summary judgment and in opposition to plaintiff's motion for summary judgment."

failure to comply with the earlier arbitration award. As a result, defendant sought "an order declaring that: 1) [plaintiff] has materially breached and repudiated the arbitration provision of the REA; 2) [plaintiff] is in default under the arbitration provision of the REA; and 3) [plaintiff] cannot enforce the arbitration provision of the REA now to compel [defendant] to arbitrate alleged new disputes." In its memorandum, with respect to the windows, defendant focused on black metal "jambs" that were located on the exterior of the building and were "rusted and corroded." Defendant claimed that plaintiff "has not fully replaced the Office Panel Window Systems, as required by the award. It has not replaced the window jambs that are a key component of the Office Parcel Window Systems." Defendant also claimed that plaintiff never signed or implemented the traffic management plan, as required by the award, and impermissibly appealed the arbitration award to the Seventh Circuit.

¶ 35    Attached to defendant's cross-motion for summary judgment were excerpts from the discovery deposition of Duane Varan, plaintiff's principal, who testified that "of course" plaintiff replaced the windows in the Office Parcel. Varan testified that plaintiff did so "[v]ery soon after the arbitration. We started the process for replacing the windows immediately after the arbitration." Varan admitted, however, that plaintiff never executed the traffic management plan.

¶ 36    Also attached to defendant's cross-motion for summary judgment were excerpts from the discovery deposition of Lyle Hill, plaintiff's window replacement expert, who testified that he had testified at the earlier arbitration hearing. Hill testified that a "mullion" was "part of the frame system," and, looking at a photograph,[6] testified that "[t]he frame system here is

---

[6]The photographs attached to defendant's cross-motion for summary judgment appear to be poor-quality photocopies. The photos contain a marking that Hill placed to identify the "right jamb." Hill does not appear to have made any markings when testifying that "[t]his would be considered a mullion." The "right jamb" appears to be a pillar on the side of the window extending the height of the window.

anything that's not a piece of glass, theoretically. So this would be a jamb. This would be considered a mullion." Hill testified:

> "Typically, a mullion divides two pieces of glass.
>
> This is the original system. So this is actually—at one time this was probably an operating window. I'm guessing this was a double-hung of some type because further down when I looked at this there were some double-hungs. The frames you could still see at one time were double-hung window.
>
> So this would probably be looked at by most people as just a single wood window opening. And then this would become then the right jamb for this very large opening. And this piece that's in here now in this picture was actually called a division bar. This would not be, for anyone from my era, called a mullion. It acts as a mullion kind of."

Hill marked the photo with a "DB" to mark the division bar, which appears to be a narrower vertical piece extending the height of the window. Hill further testified:

> "I'm going to put DB with an arrow to the center member of this opening and that would be a light weight division bar. Not a—again, there's these little nomenclature things. That's not a mullion.
>
> ***
>
> And there's an argument that would say there are no mullions in this opening because these are actually solid wood jambs with a header and a sill and the openings have been split in half with this division bar."

When asked whether the jambs "are part of the window system?" Hill testified that "[t]hey are in this application, yes."

¶ 37    Also attached to the cross-motion for summary judgment were excerpts from the discovery deposition of Zarafshani, who testified that there had been materials delivered to complete the window replacement. Zarafshani identified a traffic management plan that the arbitrators had ordered the parties to use, but disagreed with counsel's characterization of the plan as applying to more than simply addressing of scaffolding issues during the construction buildout. With respect to the windows, Zarafshani testified that his "layman's interpretation" of the arbitration award "would be that they wanted the windows, meaning the framing, and the glass replaced."

¶ 38    Also attached to the cross-motion for summary judgment was a "Declaration," certified under section 1-109 of the Code (735 ILCS 5/1-109 (West 2014)), from James Erickson, a licensed architect and registered energy professional who was also principal and president of Kellenmeyer Godfryt Hart, P.C., where his responsibilities included "investigating performance problems in distressed and deteriorated buildings; evaluating the performance of curtain walls, terra cotta, and window systems in existing and newly constructed residential and commercial buildings; and serving as a consultant during façade and window replacement projects." Erickson stated that he was familiar with the building at issue and "ha[d] performed numerous inspections of the exterior of that Building," during which he examined the façade and window systems of various floors, including the third floor. Erickson further stated:

    "6. My experience evaluating window systems has made me familiar with the different components of a window system. One of the components of a window system is the main window frame. The window frame consists of but is not limited to the side vertical jambs, the head and sill members. Additionally, in large window

openings vertical mullions supplement the framing system. They provide structural support for the window system.

7. The window systems on the third floor of the Building contain the members as itemized above. The frame members in the third floor window systems are metal, painted black, and located on the exterior of the building.

8. They provide structural support (i.e. wind loading), and are a key component of those window systems.

9. The window framing members on the third floor are original to the Building. They are rusted and corroded and the applied paint coating is peeling and failed. Rust and corrosion can compromise the structural integrity of the jambs."

Erickson stated that photographs attached to his declaration were taken by a colleague on February 20, 2017, and "depict[ed] the current condition of the third floor window jambs." The photographs are color photographs of the windows, taken from the building's exterior, that depict black vertical pillars on each side of the windows, extending the height of the window. The pillars appear to have either rust or paint chipped from them, as they are not smooth black.

¶ 39    Also attached to the cross-motion for summary judgment was the affidavit of Kim Wenkus, defendant's property manager, who averred that defendant had inspected, surveyed, and repaired the sewer pipes located in the Office Parcel; that defendant had contacted the alderman's office, requesting that the office remove the freeze placed on plaintiff's building and delivery permits; and that defendant executed the traffic management plan on April 15, 2015. Wenkus further averred that plaintiff had not returned a copy of the traffic management plan bearing its signature to defendant.

¶ 40                          C. Plaintiff's Reply/Response to Cross-Motion

¶ 41        In its combined reply in support of its motion for summary judgment and response to

defendant's cross-motion for summary judgment, plaintiff argued that the ornamental iron

pillars were not part of the windows and that an earlier expert on behalf of defendant had

agreed with that assessment. Plaintiff also argued that the traffic management plan was

intended to address closure of the alley as a result of the use of a scaffold for deliveries, and

that the scaffolding system was never used. Finally, plaintiff argued that the law provided for

judicial review of arbitration awards and that "judicial review" necessarily included appeals.

¶ 42        Attached to plaintiff's reply was an e-mail chain consisting of two e-mails between

plaintiff's counsel and defendant's counsel. The first, dated August 24, 2016, was from

plaintiff's counsel and stated:

> "Pat, just to confirm—about half an hour ago we (you, me, Adam, Kim, Marv
>
> Levin and Lyle Hill) met in the third floor space. Marv inspected the windows from
>
> the inside, spoke to Lyle, and acknowledged that the entire window systems were
>
> replaced, not just the panes. Marv also agreed that the decorative cast iron 'columns'
>
> on the outside, which are part of the original exterior and can't be removed for
>
> historical preservation reasons, are not part of the window systems. There is therefore
>
> no dispute that in this regard, we have followed the Arbitrators' instructions."

The second e-mail, in response to the first, was dated August 26, 2016, and was from

defendant's counsel. The e-mail stated:

> "This email confirms that on August 24th we met in the third floor space. Marvin
>
> Levine spoke to Lyle Hill about the windows. He inspected the windows from inside
>
> that space. Mr. Levine noted that new aluminum window frames had been installed in

addition to the new glass windows. He also agreed that the case iron columns were not part of the window system and could not be replaced."

¶ 43                                    D. Defendant's Reply to Cross-Motion

¶ 44        In its reply in support of its cross-motion for summary judgment, defendant stated that Levine had not been retained as defendant's "window expert" and so the court "should ignore [plaintiff's] attempt to argue that [defendant] is somehow bound by Mr. Levine's unsupported opinion."

¶ 45                                            E. Trial Court Ruling

¶ 46        On July 13, 2017, the trial court entered an order granting plaintiff's motion for summary judgment and denying defendant's cross-motion for summary judgment. The trial court first found that the arbitration clause of the REA unambiguously required arbitration of the instant dispute and that the parties essentially conceded this fact. Additionally, the trial court found that defendant "ha[d] failed to plead and prove that any meritorious defenses preclude enforcement of the REA Arbitration Clause." The court disagreed with defendant's contention that any contract defenses could operate to invalidate the arbitration clause but instead found that the case law provided that only defenses that rendered a contract void from its inception would have such an effect, and that there was no such defense here. The court also pointed to the language of section 22.17 of the REA, which it found "could not be more clear as to the effect of a default under *any* provision of the REA. The remedy of rescission is not available to either a defaulting or non-defaulting party, and the REA may not be rescinded in any manner 'without the written consent of all owners.' " (Emphasis in original.) The court found:

"Whether Plaintiff is in default of the REA related to a prior arbitration dispute is irrelevant to this cause of action, as a matter of law. Defendant makes no allegations that invoke a cognizable, general defense to enforcement of the Arbitration Clause. The Contract expressly precludes the remedy sought by Defendant. Although Defendant styles its defenses as material breach, default, and estoppel, the remedy provided in holding in favor of Defendant would amount to a rescission of the Arbitration Clause based upon Plaintiff's prior conduct."

Accordingly, the trial court granted plaintiff's motion for summary judgment, denied defendant's cross-motion for summary judgment, and ordered the parties to submit the matter for arbitration under the process set forth in the REA.

¶ 47        Defendant timely filed a notice of appeal, and this appeal follows.[7]

¶ 48                                    ANALYSIS

¶ 49        On appeal, defendant claims that the trial court erred in granting summary judgment in plaintiff's favor because plaintiff's failure to comply with the earlier arbitration award precluded plaintiff from relying on the arbitration clause with respect to new disputes. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance*

---

[7]On August 1, 2017, the trial court entered an order staying enforcement of the July 13, 2017, order pending appeal.

*Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 50 "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). When parties file cross-motions for summary judgment, as was the case here, "they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28 (citing *Allen v. Meyer*, 14 Ill. 2d 284 (1958)); *Ruby v. Ruby*, 2012 IL App (1st) 103210, ¶ 13. However, the filing of cross-motions does not necessarily mean there is not an issue of material fact, nor does it obligate a court to render summary judgment. *Pielet*, 2012 IL 112064, ¶ 28. " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 51    In the case at bar, defendant asks us to find that a prior breach of the arbitration clause precludes plaintiff from later taking advantage of the arbitration clause with respect to new disputes. However, we agree with the trial court that defendant has identified nothing that would prevent enforcement of the arbitration clause in the instant case.

¶ 52    The Uniform Arbitration Act (Arbitration Act) (710 ILCS 5/1 *et seq.* (West 2014)) "embodies a legislative policy favoring enforcement of agreements to arbitrate future disputes." *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 37. Thus, "[o]n application of a party showing an agreement [to arbitrate a dispute], and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration" or, if the opposing party denies the existence of an agreement to arbitrate, "the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party." 710 ILCS 5/2(a) (West 2014). "In making that determination, a three-pronged approach is used: (1) if it is clear that the dispute falls within the scope of the arbitration clause or agreement, the court must compel arbitration; (2) if it is clear that the dispute does not fall within the arbitration clause or agreement, the court must deny the motion to compel; and (3) if it is unclear or ambiguous whether the dispute falls within the scope of the arbitration clause, the matter should be referred to the arbitrator to decide arbitrability." *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance, Inc.*, 2016 IL App (1st) 161612, ¶ 26 (citing *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 443-50 (1988)). "[A]t a hearing to stay a judicial proceeding and to compel arbitration, the trial court should concern itself solely with whether an agreement exists to arbitrate the dispute in question." *Board of Managers of the Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 71 (1998).

¶ 53    In the case at bar, as noted, there is no real dispute as to whether the arbitration clause governs the instant dispute. Instead, defendant's argument is that plaintiff is precluded from seeking arbitration due to its alleged failure to comply with the prior arbitration award. Under the Arbitration Act, "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract." 710 ILCS 5/1 (West 2014). "In essence, once a contract containing a valid arbitration clause has been executed, the parties are irrevocably committed to arbitrate all disputes arising under the agreement." *Woodlands Condominium Ass'n*, 183 Ill. 2d at 74. Thus, the parties would be obligated to arbitrate the instant dispute unless there are "grounds as exist for the revocation of any contract." 710 ILCS 5/1 (West 2014). However, defendant claims that plaintiff's prior breach operates to invalidate the arbitration clause until that breach has been cured.

¶ 54    Defendant's argument rests on the theory that what it calls the " 'prior breach' doctrine" applies to enforcement of an otherwise valid arbitration clause. Defendant points to the Restatement (Second) of Contracts, which provides that "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1981). The comment to that section provides that "[a] material failure of performance has *** these effects on the other party's remaining duties of performance with respect to the exchange. It prevents performance of those duties from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur." Restatement

(Second) of Contracts § 237 cmt. a (1981). Under defendant's argument, if plaintiff "material[ly] fail[ed]" to perform by failing to comply with the prior arbitration award, defendant is under no duty to arbitrate future disputes until that failure has been cured. We do not find this argument persuasive for a number of reasons.

¶ 55        First, defendant's argument presupposes that there has been a default under the REA. However, the question of whether the contract has been breached is itself an issue that must be decided by the arbitrator in the first instance, as the arbitration clause in the REA provides that "[e]ach of the questions, differences, disputes, claims or controversies arising among or between Owners under this Agreement which shall not be resolved within forty five (45) days after it shall arise *** shall be submitted for arbitration." See *Stuart-Dean Co. v. Lurie*, 69 Ill. App. 3d 844, 846 (1979) ("[w]hether the alleged breach of the agreement and the resulting damages are within the scope of the arbitration clause is for the arbitrator to decide"; otherwise, "one could avoid complying with arbitration clauses by merely alleging that the other party breached or repudiated the contract"); *Jensen v. Quik International*, 213 Ill. 2d 119, 129 (2004) (finding that the question of whether the plaintiff was entitled to rescission of the agreement due to violations of statutory requirements was arbitrable under the arbitration clause); *Garver v. Ferguson*, 76 Ill. 2d 1, 10 (1979) (deferring to arbitrators' decision as to whether contract was properly terminated due to breach by opposing party).

¶ 56        Additionally, defendant's argument is internally inconsistent. Defendant's argument presupposes that if there was a default, it was of such magnitude that it would excuse defendant from performance. However, defendant also repeatedly insists that it is *not* arguing that it is entitled to revocation of the REA or arbitration clause and is not seeking such a revocation. But "[u]nder general contract principles, only a material breach of a contract

provision by one party will justify nonperformance by the other." *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346 (2005); see also *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70 (2006) ("Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations."). "The test of whether a breach is 'material' is whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement.' " *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43 (quoting *Village of Fox Lake v. Aetna Casualty & Surety Co.*, 178 Ill. App. 3d 887, 900-01 (1989)). " 'The breach must be so material and important to justify the injured party in regarding the whole transaction at an end.' " *InsureOne*, 2012 IL App (1st) 092385, ¶ 43 (quoting *Village of Fox Lake*, 178 Ill. App. 3d at 901). "[A]*ny* contract is terminable upon the occurrence of a material breach." (Emphasis in original.) *Jespersen v. Minnesota Mining & Manufacturing Co.*, 183 Ill. 2d 290, 294 (1998). Thus, in order for defendant's argument to have any merit, it must be the case that an alleged failure to comply with a prior arbitration award is such an egregious breach of the arbitration agreement that no future arbitration on unrelated issues is required—*i.e.*, the arbitration clause is terminated in its entirety. But defendant affirmatively states that it is not seeking to terminate the arbitration clause and seeks only to pause it temporarily until compliance with the earlier award is achieved, suggesting that defendant believes that some lesser level of "material breach" would suffice to temporarily excuse its performance.

¶ 57    However, defendant has pointed to no authority in which an arbitration clause has been interpreted in this way. Defendant broadly claims that "[t]he United States Supreme Court

has ruled that a party may assert such general contract defenses to 'avoid enforcement of an arbitration agreement' " (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.11 (1984)). However, the expansive meaning defendant ascribes to this statement of the law has no basis in the actual language used by the Supreme Court, which is limited to contract defenses that would lead to revocation of a contract.

¶ 58    Like the Arbitration Act, the Federal Arbitration Act (FAA)[8] provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2012). The Supreme Court has explained that "the text of § 2 declares that state law may be applied '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' [Citation.] Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." (Emphasis in original.) *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996). This is in contrast to the situation in which a state law is specifically targeted toward arbitration contracts, in which case such a limitation is preempted by the FAA. See *Doctor's Associates*, 517 U.S. at 687 ("Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. [Citations.]

---

[8]"Given the common origins of the Federal and uniform statutes, courts interpreting State arbitration statutes patterned after the Uniform Arbitration Act look for guidance to Federal court decisions interpreting similar provision[s] of the Federal Arbitration Act. [Citations.] Similarly, the Illinois Supreme Court has stated that judicial opinions from other jurisdictions are given greater than usual deference in construing the Uniform Arbitration Act since the purpose of the act is to make uniform the laws of those States which enact it. [Citation.]" *J&K Cement Construction, Inc. v. Montalbano Builders, Inc.*, 119 Ill. App. 3d 663, 668 (1983). See *Garver*, 76 Ill. 2d at 8 ("The Act is to be construed so as 'to make uniform the law of those states which enact it.' [Citation.] Opinions of the courts of other jurisdictions are therefore shown greater than usual deference." (quoting Ill. Rev. Stat. 1975, ch. 10, ¶ 120)); see also *Heider v. Knautz*, 396 Ill. App. 3d 553, 559 (2009) (relying on *J&K Cement* in discussing case law from other jurisdictions); *City of Des Plaines v. Metropolitan Alliance of Police, Chapter No. 240*, 2015 IL App (1st) 140957, ¶ 38 (noting that federal court decisions "can aid our interpretation of the Act").

By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' " (Emphasis in original.) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974))). Thus, this statement of the law does not suggest that anything less than grounds for revocation of any contract can operate to invalidate an arbitration clause.

¶ 59    Indeed, even the case cited by defendant shows the limitations of the language relied upon by defendant. There, the Supreme Court noted, in the context of the FAA:

> "We discern only two limitations on the enforceability of arbitration provisions governed by the Federal Arbitration Act: they must be part of a written maritime contract or a contract 'evidencing a transaction involving commerce' and such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law." *Southland Corp.*, 465 U.S. at 10-11.

In the Supreme Court's discussion, it is thus clear that the "generally applicable contract defenses" referred to by the Supreme Court are defenses that would lead to the revocation of the contract in its entirety, such as fraud. See *Southland Corp.*, 465 U.S. at 16 n.11 (listing "fraud" as a "general contract defense[ ]" that would permit a party to avoid enforcement of an arbitration clause). Defendant has not identified any cases in which the United States Supreme Court has found that a party may be relieved of its obligation to arbitrate because the other party has previously breached the arbitration clause, nor does defendant argue that

the alleged breach of the arbitration clause in the instant case rises to the level of permitting revocation of the contract in its entirety.

¶ 60            Similarly, defendant's claim that the facts of *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188 (1993), "are directly analogous to those in this case" is equally unavailing. There, the defendant refused to participate in nonbinding arbitration before the parties' architect and even threatened to fire the architect if he decided any disputes between the parties. *Mayfair Construction*, 249 Ill. App. 3d at 193-94. Accordingly, the plaintiff filed a declaratory judgment action, seeking a declaration of the rights and obligations of the parties under their contract. *Mayfair Construction*, 249 Ill. App. 3d at 195. The trial court severed the claims concerning the dispute resolution procedure from any construction defect and delay claims, "[i]n order to facilitate resolution of the crux of the dispute." *Mayfair Construction*, 249 Ill. App. 3d at 197. The portion of the matter concerning the dispute resolution procedure proceeded to a jury trial, where the jury found that the parties were required to submit disputes to the architect for resolution and that the defendant had materially breached the parties' contract by not permitting the architect to make such decisions. *Mayfair Construction*, 249 Ill. App. 3d at 198. As a consequence, the trial court found, *inter alia*, that the defendant was barred from asserting any defenses to the plaintiff's claims under the parties' contract that were to have been initially decided by the architect. *Mayfair Construction*, 249 Ill. App. 3d at 199. The appellate court affirmed this decision, finding that "if a provision creating a condition precedent to litigation is shown, a party refusing to comply with it may be barred from pursuing claims in court." *Mayfair Construction*, 249 Ill. App. 3d at 206. The court continued:

"There is no doubt that the construction contract in this case required submission of the parties' disputes to the architect as a condition precedent to litigating those disputes. [The defendant] failed to fulfill this condition. As the foregoing makes clear, such a failure can result in a complete bar to the right of a party to bring an action to litigate its contractual claims. We see no reason why that party, which willingly refused to abide by the contract's dispute-resolution mechanism, should not similarly lose its right to defend against claims asserted against it." *Mayfair Construction*, 249 Ill. App. 3d at 206.

¶ 61      In the case at bar, in contrast to *Mayfair Construction*, there is no claim that plaintiff failed to seek arbitration prior to seeking resolution of its claims before the court. Thus, there is no "condition precedent" that plaintiff failed to satisfy. Indeed, plaintiff affirmatively *sought* arbitration, and defendant is the one preventing it. Defendant claims that plaintiff's alleged failure to comply with the prior arbitration award is somehow analogous to the facts present in *Mayfair Construction*, but there is no similarity whatsoever between the two cases and *Mayfair Construction* does not stand for the proposition that an arbitration provision can be avoided based on an alleged previous, unrelated breach of that provision. At most, *Mayfair Construction* stands for the proposition that a party may not later raise claims in the circuit court that should have first been raised before an arbitrator. That situation is not present in the instant case and, therefore, *Mayfair Construction* provides no support for defendant's argument.

¶ 62      This same flaw appears in the other cases cited by defendant in support of its argument—they all involve cases in which a party has somehow failed or defaulted with respect to the arbitration of particular claims and the question is whether arbitration is required *on those*

31

*same claims*. See, *e.g.*, *Sink v. Aden Enterprises, Inc.*, 352 F.3d 1197, 1201 (9th Cir. 2003) ("a party to an arbitration agreement may not compel arbitration of claims under FAA § 4 where a prior default in arbitration *of those claims* precludes that party from obtaining a stay of litigation pending arbitration under § 3" (emphasis added)); *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (finding that after an employer had refused to arbitrate an employee's termination, the employer could not later seek to compel arbitration of that same claim after the employee filed suit in federal court); *Nadeau v. Equity Residential Properties Management Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) (whether an employer refused to arbitrate an employee's termination, the employer breached the arbitration agreement and could not later seek to compel arbitration after the employee filed suit in federal court). None of defendant's cases involves the situation present in the instant case, namely, whether an alleged *prior* default with respect to an arbitration precludes arbitration of *new* claims *unrelated* to the prior default. The case that is closest factually to dealing with such a situation, *Tri-Star Petroleum Co. v. Tipperary Corp.*, 107 S.W.3d 607, 613 (Tex. App. 2003), involves a situation in which one party's misconduct in the arbitration process itself was held to constitute a material breach of the arbitration agreement; there, the Texas Court of Appeals found that "because material breach is a ground for revoking a contract, it should be a ground for revoking an arbitration agreement." However, as noted, defendant does not argue that plaintiff's alleged breach constitutes grounds for revoking the arbitration clause in its entirety.

¶ 63         Finally, defendant's argument is unavailing because section 22.17 of the REA expressly provides that "[n]o default under this Agreement shall entitle any party hereto to terminate, cancel or otherwise rescind this Agreement or any of the easements, terms or conditions set

forth herein ***." Thus, even if defendant was correct and the REA had been breached by plaintiff's failure to comply with the prior arbitration award, such a default would not entitle either party to terminate or rescind the REA. As noted, the Arbitration Act provides that "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable *save upon such grounds as exist for the revocation of any contract*." (Emphasis added.) 710 ILCS 5/1 (West 2014). Since the alleged default in the instant case is expressly *not* grounds for termination of the contract, there is no basis for finding the clause anything other than "valid, enforceable and irrevocable." 710 ILCS 5/1 (West 2014). Defendant points to the caveat in section 22.17 that provides that "this limitation shall not affect any other rights or remedies the parties hereto may have by reason of any default under this Agreement or any written amendment or supplement hereto" and argues that precluding plaintiff from engaging in arbitration until the alleged default has been cured is merely an "other right[ ] or remed[y]" to which defendant is entitled. However, this argument ignores the language of the Arbitration Act quoted above, in which it is clear that only grounds that permit revocation of the contract would operate to render the clause anything other than "valid, enforceable and irrevocable."[9] 710 ILCS 5/1 (West 2014). Defendant dismisses as "[n]onsense" the suggestion that it is attempting to terminate the arbitration provision, claiming that both the REA and arbitration provision "remain completely alive and in existence." However, we agree with the trial court that, in practical effect, defendant's proposed "remedy" would result in the termination of the arbitration clause based on plaintiff's alleged failure to comply with the prior, unrelated, arbitration

---

[9]We note, of course, that this presupposes that the contract as a whole was valid and enforceable when it was executed. There has been no argument that the contract is invalid or unenforceable in the case at bar.

33

award. Defendant's argument is particularly disingenuous when defendant's response to plaintiff's arguments about the traffic management plan is that "[u]nder the law, [plaintiff's] persistent failure to perform until it could no longer perform did not serve to render its admitted breach moot but rather served to discharge completely any duty [defendant] had to arbitrate." Thus, defendant both argues that the arbitration clause "remain[s] completely alive and in existence" while simultaneously claiming that defendant no longer had "any duty *** to arbitrate."

¶ 64    As a final matter, we note that, as defendant has pointed out throughout this litigation, plaintiff appealed the earlier arbitration award to the federal district court, which confirmed the award and entered judgment on the award. Under the Arbitration Act, "[u]pon the granting of an order confirming, modifying or correcting an award, judgment shall be entered in conformity therewith and be enforced as any other judgment." 710 ILCS 5/14 (West 2014). Similarly, under the FAA, when a judgment is entered after an order confirming, modifying, or correcting an arbitration award, "[t]he judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." 9 U.S.C. § 13 (2012). Thus, if defendant was concerned that plaintiff was not complying with a court's judgment, the proper avenue would be to seek recourse with that court in order for the judgment to "be enforced as any other judgment" (710 ILCS 5/14 (West 2014)) instead of simply refusing to engage in arbitration until defendant was satisfied with plaintiff's compliance.

¶ 65                                   CONCLUSION

¶ 66         For the reasons set forth above, the trial court properly determined that plaintiff's alleged failure to comply with the prior arbitration award did not preclude plaintiff from seeking to arbitrate the instant claims, which were unrelated to the prior arbitration.

¶ 67         Affirmed.